UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | Case No. 24-cr-330 (BAH) |
| v. | : | |
| | : | |
| BRANDON PETTIT, | : | |
| | : | |
| Defendant | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. Brandon Pettit has pleaded guilty to two second degree misdemeanors, a violation of 40 U.S.C. § 5104(e)(2)(D) (disorderly or disruptive conduct on the grounds or in the buildings of the United States Capitol) (Count One) and a violation of 40 U.S.C. § 5104(e)(2)(G), (parading, demonstrating, or picketing in any Capitol building) (Count Two). For the reasons set forth herein, the government requests that this Court sentence Pettit to 30 days of home detention as a condition of 36 months' probation for Counts One and Two. The government also requests that this Court impose $500 in restitution.

**I.      Introduction**

Defendant Brandon Pettit, a 72-year-old, small business owner, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States

1

The government's recommendation is supported by Pettit's (1) age (2) expression of remorse and (3) limited amount of time in the Capitol building. However, the Court must also consider that Pettit's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. Here, the facts and circumstances of Pettit's crime support a sentence of 30 days of home detention and 36 months of probation in this case.

II.  **Factual and Procedural Background**

*The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 31 (Statement of Offense).

*Defendant Pettit's Role in the January 6, 2021 Attack on the Capitol*

Pettit traveled to Washington D.C. with his co-defendants Eric Oliver ("Oliver") and David Mullsteff ("Mullsteff") on the morning of January 6, 2021 from their homes near Richmond, Virginia. Pettit, Oliver, and Mullsteff attended the Stop the Steal Rally at the Ellipse and stayed for the entirety of former President Donald Trump's speech.

---

Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.



*Still Image #1: Pettit (yellow circle) and Mullsteff (blue circle) at Stop the Steal rally*

After former President Trump's speech concluded, Pettit, Oliver, and Mullsteff walked to the Capitol grounds. The three approached the Capitol from the west side of the building where rioters had clashed with police and tear gas and flash bang-type munitions had been deployed.

While on the West Front, Pettit admitted to hearing a bang noise, and seeing a group of rioters yelling at police. Despite the obvious chaos on the West Front, Pettit and his codefendants ascended to the Upper West Terrace and into the Senate Wing Door.

Pettit entered the U.S. Capitol building at approximately 3:21 p.m. At that time, numerous police officers were inside the foyer area wearing riot helmets and an alarm was blaring continuously. Some of the rioters exited the building through a smashed window directly next to the Senate Wing Door.



***Still Image # 2 Pettit (yellow circle) enters the Senate Wing Door behind Mullsteff (blue arrow) and Oliver (red circle)***

Pettit remained close to the Senate Wing Door and took out his cell phone to photograph or record the crowd in the foyer area.



***Still Image # 3 Pettit recording on his phone***

As Mullsteff and Oliver advanced further into the foyer area, Pettit remained next to the Senate Wing Door for less than a minute before exiting the building.



*Still Image #4 Pettit next to Senate Wing Door*



*Still Image #5 Pettit turns and exits the Capitol*

*Pettit's FBI Interview*

On May 24, 2021, Pettit was interviewed about the events of January 6, 2021. Pettit told the FBI agents he went to the rally to see then-President Trump and hear him speak. Pettit was cooperative and identified his codefendants. Pettit stated that after Trump's speech concluded, he was told that other speeches were scheduled to take place at the Capitol building. Pettit admitted to seeing a group of rioters outside the Capitol who were wearing riot gear and encouraging others to be violent, but Pettit denied personally seeing violence.

Pettit and Mullsteff became separated from Oliver. By the time Pettit arrived at the Capitol building, he stated that other individuals were already on the "balcony" of the Capitol. Pettit denied seeing "guards or borders" preventing entry on his way to the Senate Wing Door. Pettit and Mullsteff reconnected with Oliver before entering the Capitol. Pettit stated that there was a long line to enter the Capitol and it was very crowded.

Pettit expressed remorse saying he wished that he had not attended the rally on January 6 and stated he would cooperate with authorities.

On February 7, 2022, Pettit cooperated in a second interview with the FBI agents and identified himself and Mullsteff in still images from the Capitol. Pettit also attempted to identify Oliver but was not sure if the still image showed Oliver because he wore a neck gaiter over his face; however Pettit said it was "probably him" based on the camo pants the individual was wearing.

*The Charges and Plea Agreement*

On July 18, 2024, the United States charged Pettit by a four-count Information with violating 18 U.S.C. 1752(a)(1) and (a)(2) and 40 U.S.C. 5104(e)(2)(D) and (e)(2)(G). On August 2, 2024, pursuant to a plea agreement, Pettit pleaded guilty to Counts Three and Four of the

Information, charging him with violations of 40 U.S.C. 5104(e)(2)(D) and (e)(2)(G). By plea agreement, Pettit agreed to pay $500 in restitution to the Architect of the Capitol.

### III. Statutory Penalties

As noted by the plea agreement and the U.S. Probation Office, Pettit faces up to six months of imprisonment and a fine of up to $5,000. Pettit must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV. Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of a sentence of home detention and probation.

#### A. The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Pettit's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Pettit, the absence of violent or destructive acts is not a mitigating factor. Had Pettit engaged in such conduct, he would have faced additional criminal charges.

7

### B. Pettit's History and Characteristics

Until January 6, 2021, Pettit lived a law-abiding life. He graduated from Elon University in 1976, is married, and has two adult children and five grandchildren. Pettit previously worked in construction and insurance and now owns a small Kettle Korn business.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of home detention in this particular case. *See United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.")

### D. The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

General deterrence may be the most compelling reason to impose a sentence of home detention in this case. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic

8

processes we have: the peaceful transfer of power to a newly elected President. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

While Pettit only entered the Capitol building for a brief time, some amount of punishment is necessary to deter him from committing future crimes. Despite going to the Capitol to see additional speeches, Pettit chose not to leave once he arrived and no speeches were taking place. He advanced on the building after hearing a bang and seeing rioters in gear encouraging violence. Once at the Senate Wing Door, he chose to enter despite an alarm, broken windows, and the large crowd filing into the Capitol while police in riot gear were standing in the foyer.

With the 2024 presidential election approaching and many loud voices in the media and online continuing to sow discord and distrust, the potential for a repeat of January 6 looms. The Court must sentence Pettit in a manner sufficient to deter him specifically, and others generally, from going down that road again.

### E. The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers.[2] This Court must sentence Pettit based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

---

[2] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

Pettit has pleaded guilty to Count Three Disorderly and Disruptive Conduct in a Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(D) and Count Four Parading, Demonstrating, and Picketing in a Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(G). These offenses are Class B misdemeanors. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. § 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), do apply, however.

Although the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. James Lollis* 21-cr-00671 (BAH), the defendant entered through the Senate Wing Door at 3:22 p.m. While inside, the defendant asked an officer if he was on "the same team" and taunted the officer when he did not receive a response. The defendant exited the Capitol at approximately 3:27 p.m., but did not leave Capitol grounds, instead staying to watch the violence on the Lower West Terrace. This Court sentenced the defendant to three months of home detention, as a condition of 36 months of probation and $500 in restitution. In this case, Pettit stayed in the Capitol for a shorter amount of time and did not taunt any officers, therefore, justifying a lower recommended sentence of 30 days home detention.

In *United States v. Corey Horan*, 24-cr-5 (RDM), the defendant entered the Senate Wing Door with his 14-year-old son at 3:23 p.m. and stayed in the foyer area for a few minutes before

leaving through the same door at 3:26 p.m. After leaving, the defendant and his son were near the violence at the North Doors. When the defendant was interviewed by the FBI and probation, he downplayed the events of January 6. The defendant was sentenced to 60 days of home confinement and 60 hours of community service as conditions of 36 months of probation and $500 restitution. Pettit stayed in the building for less time, did not advance past the entrance way to the Senate Wing Door and did not bring a minor child with him, therefore justifying the lower recommended sentence. Pettit was also remorseful and honest with the FBI and immediately sought to accept responsibility.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

V.     **Restitution**

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639

11

F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[3] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Pettit must pay $500 in restitution, which reflects in part the role Pettit played in the riot on January 6.[4] Plea Agreement at ¶ 11. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023." *Id.* Pettit's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 89.

---

[3] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

[4] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

## VI. Fine

Pettit's convictions for violations of 40 U.S.C. §§ 5104(e)(2)(D) and (e)(2)(G) subject him to a statutory maximum fine of $5,000. *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, this Court should consider Pettit's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d).

The burden is on Pettit to show present and prospective inability to pay a fine. *See United States v. Gewin*, 471 F.3d 197, 203 (D.C. Cir. 2006) (explaining that "it makes good sense to burden a defendant who has apparently concealed assets" to prove that "he has no such assets and thus cannot pay the fine"); *United States v. Lombardo*, 35 F.3d 526, 528 (11th Cir. 1994).

Here, Pettit has not shown an inability to pay, thus pursuant to the considerations outlined in U.S.S.G. § 5E1.2(d), the Court has authority to impose a fine. § 5E1.2(a), (e).

## VII. Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Pettit to 30 days of home detention as a condition of 36 months' probation and $500 restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on Pettit's liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:    *s/ Kyle R. Mirabelli*
KYLE R. MIRABELLI
Assistant United States Attorney

                    N.Y. Bar No. 5663166  
                    601 D Street, N.W.  
                    Washington, DC 20530  
                    (202) 252-7884  
                    Kyle.Mirabelli@usdoj.gov